Good morning. I'm Michael Bowen. I'm here for the appellant, Orly Genger, who is the granted summary judgment against Orly Genger and in favor of the plaintiff, her brother, Sagi Genger, on an indemnification agreement because of two findings of fact that are related in the district court's mind below. The first was that Orly Genger monetized to the tune of pursuant to a tripartite agreement between herself, her brother Sagi, and her mother, Dahlia Genger, and that because she had monetized that asset, she was therefore obligated under that same three-way agreement and it was only fair that she would have to pay one half of any demand for a lifestyle payment by the mother, Dahlia Genger. Can I just ask you, please look at page A-16. That is the agreement that your client countersigned and it said that she will reimburse her brother for half of what he pays for the support of their mother. Yes. Correct? That's, well, what, you can't tell me that's not what that says. No, it is what it says, but there's two issues, two issues of fact that belong, that attach to that. Before you get to that, are you going to say she didn't sign it? I'm going to say there are issues of fact as to the authenticity of that document, yes. It's a Xerox signature of her name. It's not her signature. She says she doesn't remember signing it. That doesn't mean she didn't sign it. But she disputed it, your honor. She disputed it and she said there is evidence that I didn't sign it and she gave that evidence in her counterstatement and under Rule 56. The authority that the judge relied on said that if you ignore a 56 statement and don't respond at all, or if you respond by giving some non-responsive answer, then that's deemed an omission. But here she responded and she gave a responsive answer. Her responsive answer, no, her responsive answer was I don't remember, but I remember other things that were happening in that time. If this had happened, I would have remembered it. That was her testimony. That was what she said in her declaration and that was the counsel below. If you say I don't remember it, but if it happened, I would have remembered it, then you could swear that it didn't happen. Isn't that correct? She says if it happened, I would have remembered it. That's correct. That's a denial. That's saying it did not happen and I have evidence that I can take to a jury and there's other contextual evidence as well. If you look at the cases, the no memory cases... Let's just assume that it's authentic for a little bit. Exercise. How could there be a failure of consideration for this if her brother undertakes to support their mother and she says if you're going to do that, I'll pay half. Why isn't there consideration for a sister agreeing to contribute half of the cost of the mother with her sibling? There are two, actually three responses to that. Two of them is a legal question. The first issue of fact is the way the judge construed this language below, she said it has to be integrated with the letter. It isn't. Why do we have to integrate it? Well, it should all be read together because you have to understand the intent of the parties and under this language taken in isolation, it's not clear what the intent of the parties is. It would be unreasonable. In isolation, this is related to the letter on the prior page, which is from her brother to their mother. Right. That document refers to a divorce agreement in which the TRI shares were originally... That's correct. That refers to what it is, the obligation he is undertaking, which is limited to the proceeds from the transactions that you're talking about, but her undertaking isn't. As I read her undertaking, she would owe half of it whether she got $32 million or $1 million or whether she was a bag lady in the street. I agree that's what it says if you read it in isolation, Judge, but you can't read it in isolation. Even the district court below didn't read it in isolation. In fact, she said the opposite. She said that Sagi, the brother, never would have entered into that first agreement with her mother unless he knew for a fact he was going to be getting 50% from his sister because half of the value of the TRI shares coming from the mother were going to be... The consideration was, the intention was, would be going to the sister. The district court said exactly what you said, Judge, but she said it in favor of the move-in. The inferences also need to be taken in favor of the non-move-in. The fact here is that she didn't get a dime. There's no evidence that she monetized anything. The only evidence that's in the record is a settlement agreement that was put in the record on the same day that the summary judgment motions were... Was the $32 million in a trust for her benefit? No. The $32 million is not in a trust for her benefit, and there's no evidence that it is, Judge. The settlement agreement involved what's called the AG group. She was one party out of four to that AG group. Therefore, the brother didn't get anything either? No. The brother, this is the fascinating part, the brother did monetize the TRI shares. In fact, he monetized all of them, both his and his sister's, and they went to a company called TPR, which he is in control of. Then he went through another process to foreclose on her interest in TPR, so all of the money is controlled by him. This gets to some of the evidence that we've been presenting to the court through the Rule 28 letters, showing that we now know that all of that money resides overseas, in overseas accounts, in the Cook Islands and Lichtenstein. In order for a judge sitting here in New York to decide whether A16 says what it says, you have to look at a complex of corporate transactions conducted inside a family-owned business with everybody contradicting everybody else. It's a trial. That seems like a really inefficient way of resolving it when all you have to do is to say that it is sufficient consideration for one sibling to agree to indemnify the other sibling for half of what that other sibling spends on the support of a parent. It may be more efficient, but it would be simple, but not just. When people want to avoid a simple obligation, good lawyers can make anything fantastically complicated, and you're a good lawyer. Thank you, Judge. The point is that the reality here is that there are other legal issues. For example, there was no opportunity for her, for Orly, as the indemnitor, and this is a strict question of law, to come in and interpose a good faith defense or a lack of good faith defense to the mother's demand. There's no evidence in the record, Your Honor. If you look at the record, there's no evidence in the record that the mother, Daya Ganger, had a good faith basis to ask for $200,000 in the middle of multiple litigations going on between the siblings. Ten years after this document was supposedly signed, which we don't agree was actually signed, which has a Xerox signature on it, with no reference to it for ten years, it comes out of the blue in the middle of this document. This is all in the record. We need to look into this. This was supposedly done ten years ago. Has anybody asked for the original of the letter that appears on page 816? Absolutely, Judge. We have asked for it repeatedly. It was never produced. There's no explanation. There's no explanation of why that's a Xerox signature. None. And the evidence... Well, we don't know if it's a Xerox signature, but the... No, that's undisputed. ...authentic signature. Judge, it's undisputed. You mean that it is cut out of something, Xerox, and then cut out of something and put in here? There's no evidence of cutting and pasting, but the evidence of her signature is that it's a photocopy, not an original ink signature, and there's no dispute about that. His signature is... We only dealt with original documents when we go back to the 1930s. Well, that's true unless there's a reason to have some suspicion. If you go to the best evidence, well, that still applies today, and the question is, the proponent of the document, when there's other indications that there's something, there may be something amiss, and in this case, there certainly are indications of that, given the document itself and then given all the surrounding circumstances, including the testimony by Orley. And just to get back to my opportunity to defend, because what happened is we said we need to investigate this document. Before they gave us any opportunity to investigate whether the demand by the mother was legitimate, Sagi Ganger paid the $200,000 and sued us the next day in federal court. You can ask questions about why we're in federal court at all, but that's brief, and I'm going to rely on the brief for that, but the fact of the matter is, is that by law, by New York law, because you didn't give us an opportunity to interpose a legitimate defense that this was no good faith demand for lifestyle of payment, and even though she has sole and absolute discretion, the law is clear, that doesn't get you outside of... You can't just make bad faith demands, and now we know, we know from state court trials where every court that has ever heard Sagi Ganger testify has found him to be not credible, that he falsifies documents, that he backdates documents, that he's defrauded his sister, that he's breached his fiduciary duty to his sister. We know that the mother has millions of dollars in overseas accounts that are managed by the brother, and have been for years, including back in 2014 when this demand was made. We'll hear you on rebuttal. Thank you. May it please the court. Sarah Reed for the plaintiff, Appali Sagi Ganger. Your honors, we're here today on an appeal from the grant of summary judgment, enforcing a simple and unambiguous promise made by my client's sister in 2004 to her brother. It's unquestioned that in October 2004... Is there an original copy of this letter? Your honor, the original... Have they asked for the original? No. Your honor, no best evidence... You know, we can't conduct a trial here. No. Your honor, may I please... Have they asked you? I'd be really surprised if they didn't ask you for the original. Your honor... Have they have asked you? No. Okay, let me back up and be precise. Be precise. In the trial record, right, the record that the district court had, there was no best evidence defense ever raised to this document. And let me be clear, there was no forgery defense. The question that was asked was not that, but the question was, did they ever ask you for the original? What's the answer? That's got to be a yes or no question. I think that in the course of the underlying proceedings, which I was not involved in, your honors, they asked, but that ultimately there was no... And was it produced or not? No, because the original document is the document that they have with her signature photocopied. Appellant left the signed, executed letter with her doorman, and it was a photocopy. She has the original ink signature, if it still exists. What then happened is my client signed that photocopied, her signature with the photocopy, signed it in ink. That is the original document in this case. The signature agreed to was applied to this document before the letter was signed by your client? No, no, your honor. I'm sorry if I'm not being clear. I just want to be sure. You're saying she gets an unsigned version. She signs it. She copies it. She gives that to the fellow to deliver to your client, and he then signs it. He then signs it, yes, your honor. The final agreement, which has the signature of both, is in your position. Right, and that one has... And has that... Was that produced or not? Yes, that's definitely been produced, and not only was it produced, it has been examined by handwriting experts on both sides. It's been produced, but it contains a photocopied signature because, as you explained things, Orly gave nothing but a photocopied version to her doorman. Exactly, your honor, and what was then happened, that original... Isn't that sort of strange on its face? Why would... If she wanted a copy, she would make a photocopy and keep the photocopy. She would deliver the original, and her testimony is that I don't have a specific memory of, but I think if I had signed it, I would have a specific memory. At least that's what your adversary said. If your honors would bear with me for a moment, I think it's really important to understand what happened, what the district court had before her. At the initial pretrial conference, Orly's attorneys raised the possibility that this was a forgery, that it was inauthentic. They hired handwriting experts who looked at this original document. Those experts never put in any report. On the other hand, Segee's expert looked at it and opined based on the photocopied signature, and there is in the record his declaration that it was original. Furthermore, and this is really important... First of all, you can't say that a photocopied signature is original because it isn't by definition. Second, very few reputable handwriting analysts will opine as to something that is photocopied, because you don't have the weight of the pen, you don't have the flow of it. If you deal with the original, otherwise I don't know what it is. Your honor, respectfully, I disagree. A handwriting expert put in two affidavits. They're both in the record. He explains at great length in the reply affidavit why what he has done is well within the accepted bounds, and how their own expert who criticized it had authenticated signatures based on fax copies. I'm sorry it's part of this case, but I think there is increasing evidence from the National Academy of Science that handwriting experts are not reliable, period. I want to go to the Rule 56 statement. I think there was no contradictory expert. They did not put in an affidavit saying it wasn't her signature. This is the part that I really need to get to. All they did was criticize the fact that we had put in an affidavit. Did the expert criticize the fact that you put in an affidavit or criticize the opinion of your expert? It criticized the opinion, but without saying her signature was inauthentic. Criticizing the methodology. When you look at— Why did it become a factual issue under Rule 702? Because, your honor, and this is really important, because I think somehow this argument has really gotten away from what was before the court, because the court was dead right on this. There was no forgery defense raised. There was no forgery defense raised on the summary judgment motion. There was no jury instruction submitted for the trial that was to start on December 15th. There was no affirmative defense ever pled. There was no request that it ever be pled. And when, in the Rule 56.1 statement, when Sagi stated at paragraph 11, in the second sentence, that she has denied the existence of this indemnity and her counsel has alleged in open course at the court that the document is a forgery, the response was, second sentence disputed. That was that sentence. At the initial case conference, in the prior case, Orley's counsel stated they believed the document was a forgery and would conduct diligence to determine it. Orley's counsel hired an ink expert and document expert to do so. But it is contested that that expert never put in a report of any sort saying it was inauthentic. There was no jury instruction ever submitted on the forgery point. Assuming A-16 is authentic, do you rely on that and that alone? Or do you rely on the district judge who ruled in your favor that this is part of three interlinked and bound together documents that constitute a single agreement? I, of course, rely on the judge's opinion, which I've not, I mean, I think is completely correct in its careful analysis of the actual record. You have to look at all three. No, you don't have to look at all three. And the court was very, I'm sorry to interrupt, Your Honor, but the court in a footnote said she explicitly was not looking at the divorce agreement. She did not need to reach it. The two integrated documents are... You do have to look at the document that we've been discussing and... And the promise. The promise agreement. Right. Those two are integrated and I think there is no question as a matter of law they are integrated. The indemnity attaches the promise document. So that basically the allegations or the argument today is based on a record that did not exist before the district court. Can you address your adversary's additional argument that there was, what amounts to, I believe, a failure of consideration. She never received value. Your Honor, this goes back to, again, what was actually presented to the district court. And what is being said now, that she never has actually received any money, was never argued to the district court. Is there a decision extant today from the Delaware court that says that the trust that there was no beneficial ownership conferred on her, her brother, or her father by this transfer of stock because the stock transfer should have been conferred? No. And what has happened here, what was transferred was the beneficial interest, whatever that might be, in these shares. There is no question that Orly and her group, which consisted of two creditors and her father and her, were able, in exchange for giving up their claims to these shares, to monetize it for $32.3 million, just as the court said. You say there's no dispute about it. I'm not sure it matters one way or the other, but what's your basis for saying that there's no dispute? Is it that it was alleged, and the 56.1 statement did not contradict? No, no, no. Basically, there's a settlement agreement. There was a history to this. First, the Orly refused to disclose the settlement agreement from July 2013 in which she'd had a dispute with the court. Show me the page where she said, I won't produce it because it is irrelevant. I mean, you have no shortage of appendixes. I know, unfortunately. Do you want me to read the whole thing? No. What page do you have in mind? My co-counsel will find the page. So basically, the judge reversed her, initially granted that motion to compel, but in the midst of summary judgment briefing, realized that this settlement agreement was relevant to whether or not she had monetized those beneficial interests and ordered it to be produced. Appellant then made an emergency appeal to this court to try to prevent the production. The court denied that. The settlement agreement was actually produced. Reading that settlement agreement, which is at A5052 at SEC in the appendix, makes it crystal clear that the agreement is an agreement to resolve all the issues, disputes, and disagreements, including but not limited to the ownership of all of the trans-resource chairs, and that Orly signed this in her individual capacity and in her took to thereafter, in all the litigations that were pending, to make it clear that she had relinquished her claim to these chairs, to any of the TPR chairs that she had. So she relinquished it? Right. And she got paid, or the group got paid $17.5 million, as the court notes, for, in essence, the balance of the money, bringing it up to $32.3 million. I guess what I'm asking is, at the time, is there a question here about either failure of consideration or mutual mistake in that, in fact, there was no beneficial interest ever conferred? Why is it so relevant, whether she was able to settle a dispute later on? You're talking about the contract when it took place. Because it is relevant because it shows that the beneficial interests, as the court found, were indeed transferred, and they were worth— What's the evidence that she has a beneficial interest in—that she had a beneficial interest in the chairs? The interest is that her mother transferred them to her, and that she was able to settle based on them. I mean that there are two blocks of shares, one for the Saagi Trust and one for Orla. Has your client taken the position in other litigation that she had no beneficial interest in the shares? No. No. And I think this is, again, the issue of what was before the court. The consideration argument that was before the court was mutual mistake, which is not a subject of this appeal. Mutual mistake is different from lack of consideration. I know, but what they'd used as the lack of consideration was, in essence, a reprise, a reprise of the argument of mutual mistake. That's not on appeal. The judicial estoppel point is not on appeal. And the grounds for what is on appeal that was actually argued before on the consideration and also on the failure to tender the defense— You would agree based on— Are different. Everything you're saying, that if she got nothing and took nothing and realized nothing, then there's a root failure in the nature of her promise to repay her brother one-half of what he spends on their mother. Your Honor, she— You know, I haven't— I understand— You know what's interesting? I haven't gotten a yes or no answer from either one of the sitting here, and I'm kind of wondering whether I'm not just wasting my time. Your Honor, I apologize. I have tried very hard to answer your case—I'm sorry—to answer your questions. You had asked for the site concerning the—in the appendix— She did not produce the document showing that she monetized. Okay. Or did not monetize it. It is in the docket, docket 25, October 3rd— No, I put the page. The page you have—you have volumes and volumes and volumes. What do I need the number of the document? Give me the number of the page. I'm sorry. We gave you— Well, how do you expect me to find the document if you don't give me the page number? Do you want me to read through 16 volumes? I don't know why I have 16 volumes. Your Honor, I apologize for that. Your time is up. We'll hear rebuttal. Can I make one quick point? Not unless there are questions. Go ahead. Your Honor, the whole question about this settlement, the $32 million settlement, is that if you read that document, it's not clear what the money is being paid for or that money has actually even been paid and to whom. The fact of the matter is that Orley was not the only party that was a potential recipient under that document. There was a mention by my adversary that there was some dispute at the time before— Well, if she's—if, indeed, she is releasing any interest in something that is potentially worth $32 million, even if it's shared, you have to assume she's getting more than a peppercorn, wouldn't you? But in this case, because—no, the answer is no, Judge. If you look at that document, there's a half a dozen litigations that are mentioned. Some of them involve her father, not her. She's not involved at all. The record that Judge—or the question that Judge Livingston asked is, was there a decision that the trust, the TRI shares, were never actually transferred to either her or her trust? And the answer to that is yes. It was the Delaware decision first that said this violated a stockholder's agreement and the money belongs to the company, TPR, which is controlled by Siggy. All of those TRI shares were controlled—belong to TPR. That was the record ownership. Then there was a question about the beneficial ownership, whether there could be some other transfer of value, even though all of the shares, even those that were supposed to be sent to Orly's— We're never—we are never—we are never going to understand all of these transactions, many of which sound to me quite shady by your explaining it right now. But let me ask you this. Did Orly ever say that she would not produce the document showing how her beneficial ownership was monetized? There was no document that shows that her beneficial interest was monetized. So the answer to that is no, she never said that. Your adversary said there was an interim appeal. What was the issue in that interim appeal? That pertained to this settlement agreement by the Trump group with the AG group, which refers to litigation over TRI, not just the TRI shares, but other issues involving TRI and the father. That there was an—that document was like a 30-page settlement agreement, which Orly signed, but the trust—her trust didn't sign, and her father signed it. A bunch of people signed it. There was an appeal on that because there's a—some of the payments under that agreement that, by the way, there's nothing indicating it's going to Orly. It's going to this group, including her father, are contingent on there being no more If that confidential settlement agreement was turned over to Sagi, exactly what would happen was exactly what happened, which is that he then had his mother sue the Trump group to get any proceeds paid under that settlement agreement transferred not to Orly, even though she already has a judgment against her for $100,000, but all of that money, to the extent it has anything to do with Orly, would go to her trust. And who controls the Orly trust? The mother, Dahlia. I agree, Judge, there's a lot of interactions and convoluted facts in this case, but that's why it's not a summary judgment case. This decision— Why isn't the fact of the settlement agreement—it's now part of the record—that suggests that your client was part of the settlement show that she received consideration, at least a peppercorn, as part of this group? So that there's nothing erroneous about the either a valid or invalid beneficial interest. But the reasoning that the district court used, which we submit is wrong on a lot of different reasons for September 4th in our briefing that we've already discussed here, the reasoning that she used was that the intent of the mother was to give equally to two children and that Sagi realized $36 or $31 million and Orly realized $32 million. So in effect, it wasn't equal distribution and all she's asking for is her elderly age. That's it. And if you look at it that way, this agreement, which looks simple on its face, Judge, but when you really dig down into it, it's much more complicated, would make sense. But the point here is Orly did not get $32 million and there's no evidence that she did. You can't just look at this convoluted—and I agree it's convoluted, Judge, we can talk about why—you can't just look at that document and say, oh, no issues of material Did she enter into an agreement to relinquish to anybody any interest she has in the $32 million? No. There's no agreement among these parties and there's certainly nothing in the record about what that $32 million is for and how it's going to be— You didn't ask what it's for. I said if—I understand you. Who cares what it's for? The issue is much simpler than that. Is there any evidence that at any point she held any interest or power to give, keep, or dispose of the $32 million at any point? No. There's no evidence of that whatsoever. And therefore, we're talking—there was no agreement in which she relinquished an interest in it. There's an agreement in the settlement agreement, if you read it, she said, I'm not going to make any claims relating to the TRI or TRI shares, whether she had the ability to do that— Now, if she did that, why would she do that unless she got at least $1 in consideration? The fact of the matter is if I was the lawyer for the other side, I wouldn't let her sign that unless I gave her $1. There's no evidence that she got any consideration, Judge. None. That's the fact of the matter. The fact of the matter is that this case cannot rest on this kind of a record which raises question after question after question. And if it does, if the decision below is allowed to stand— Is this case about $100,000? No, Judge, it's not because it's not really clear. There's been no—our position is there's been no adjudication, even in this decision, no adjudication of how much money Orley realized from this transfer of TRI shares. Well, give us a make, as long as it's a dollar. Because the district court's decision says with the parties got it equally, they have to equally contribute back to the mother. That's the whole intent of the mother. Well, what if your client only got $10 million? Why would it be outrageous to expect her to read it with the divorce stipulation the agreement was? And this is what Judge Forrest found, that the intent—and she says this repeatedly, page 20 of her decision says the intent, the clear intent, was that the children would receive equal value, equal value. Not that Orley gets nothing and the brother gets $60 million, or not that Orley gets a few million and the brother gets $60 million. The problem with this case, Judge, is if this decision is allowed to stand, then there's a question of what—it would have to—if there's another demand made by the mother that's made in good faith, and we challenge it and that good faith is upheld as being made in good faith, then there has to be adjudication about how much money Orley got. Thank you. Thank you both. We'll reserve decision. The case of United States versus Shoemate is taken on submission. The case of 1077 Madison versus Courtney Smith is taken on submission. That's the last case on calendar. Please adjourn court. Court stand adjourned.